# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 8:08CR53 |
| ) | |
| DANNY D. JOHNSON, ) | REPORT AND |
| PATRICIA LYNN JOHNSON and ) | RECOMMENDATION |
| REALHUNTS, INC., ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on the defendants' Motions to Suppress Statements (Filings 31 & 32). The evidentiary hearing began July 23 and concluded July 31, 2008. The transcript (Filings 54, 55 and 56) was filed August 7, 2008, at which time the motions were deemed submitted.

## INTRODUCTION

The defendants, Danny and Patricia (Patti) Johnson (together, "Johnsons"), are shareholders in and the operators of Realhunts, Inc. ("Realhunts"), a closely held corporation. Realhunts is located near Decatur, Nebraska and provides lodging and game hunting land access to paying customers. In January 2007, a former associate, Brian Nielsen, advised law enforcement that Johnsons were violating certain game laws in their operation of Realhunts. After an investigation focusing on a 2005 hunt involving Wisconsin hunters and a 2006 hunt involving Tennessee hunters, a search warrant was issued for the Realhunts hunting lodge,

which is also the Johnsons' residence. The warrant was executed on May 16, 2007, at which time the Johnsons both made statements to law enforcement. The Johnsons also conversed with law enforcement officers on July 11, 2007. No *Miranda* warnings were given on either occasion.

On February 21, 2008, the Johnsons and Realhunts were indicted on charges of illegally transporting wildlife. *See* 16 U.S.C. §§ 3372(a)(2) & 3373(d)(1)(B); 18 U.S.C. § 2.

The defendants contend that the statements given by Danny and Patricia Johnson on May 16, 2007 and July 11, 2007 were not voluntarily made because the statements were extracted by threat, express or implied, which was sufficient to overbear their will and critically impair their capacity for self determination, in violation of the Fifth Amendment to the Constitution of the United States.

The government contends that the defendants were not in custody when the statements were made; therefore, *Miranda* warnings were not required.

## FACTUAL BACKGROUND

Special Agent Mike Damico, a United States Game Warden, testified that he was the lead agent for the service of a search warrant on May 16, 2007 at the Johnson home. According to Damico, he and five state officers, for a total of six officers, arrived at about 6:45 a.m. and entered the Johnson home/hunting lodge. They were first met by Lorna McGovern, a visitor in the Johnson home who had spent the night. Officers first secured the

home as part of a protective search, knowing that there were weapons in the hunting lodge. By approximately 7:30, Damico began interviewing the Johnsons in the kitchen/breakfast bar area. The interview lasted 2½ to 3 hours. Damico noted that the defendants were seated, but were informed that they were free to leave, but if they left they could not return until the search was concluded. They were also told that they were free to move about. During the interview, the Johnsons offered the officers coffee and soft drinks. No *Miranda* warnings were read and no arrests were made.

Damico noted that sometime during the morning Lorna McGovern left the Johnson home to go to work. Two of the state officers left the property around 8:45 a.m., after the initial search of the home, while Damico was questioning the Johnsons.

According to Agent Damico, the Johnsons volunteered to him that there were things the officers might be interested in, e.g., records, information, and photographs. Patricia Johnson volunteered the location of the photographs and gave information about individual photographs. At about 11:15 a.m., the Johnsons executed written statements/affidavits (Exhibits 1 & 2). Damico described his conversation with the Johnsons as being cordial and friendly. The Johnsons referred to him as "Mike" at least twice, and they later telephoned him about how they should handle future bookings and reservations that had been made by hunters for the Fall season. Agent Damico also testified he was aware that Patricia Johnson had surgery the day before. Before Damico left, the Johnsons signed the property receipt (Exhibit 3).

Nebraska Conservation Officer Jeremy Tenkley testified that he was present when the search warrant was served on May 16, 2007. He heard Agent Damico tell the Johnsons that they were "free to leave." Tenkley believes that the officers arrived at the Johnson residence before 7 a.m. and were there about three hours. Tenkley was not present for all of the conversations, but he did hear the Johnsons talk about the photos. The defendants were cooperative and were not hostile at any time.

Special Agent Mark A. Webb of the United States Fish and Wildlife Service testified that he had no contact with the Johnsons on May 16, 2007; however, he was the primary agent in obtaining the search warrant. On July 11, 2007, Webb and Nebraska Conservation Officer John Reeves were returning to Nebraska from Wisconsin, where they had conducted interviews as part of the Johnson investigation. On their way back, they stopped at the Johnson home to retrieve a coyote pelt. Agent Webb stated the stop also offered an opportunity for the defendants to be educated about the case and advised as to the nature of the case. The officers also tried to clarify a few points of conflicting information, e.g., which of the family members had supplied their deer permits for hunters from other states.

Upon their arrival, Webb and Reeves were invited into the home. Webb described the Johnsons as cordial, and noted that he was offered refreshments. The officers advised the Johnsons, who were both present, of the status of the investigation. They explained that the investigation had led officers to Tennessee and Wisconsin and that felony violations were believed to have occurred, including violations of the Lacey Act. The Johnsons were advised

that charges may be filed. No arrests were made on July 11, 2007 and no *Miranda* rights were ever read.

During the conversation, the Johnsons were asked to clarify some points about who had supplied deer permits for the Wisconsin hunters. The officers also discussed their belief that perhaps the Johnsons' children had also committed acts for which they could be charged. The Johnsons specifically gave the names of four relatives who had supplied deer permits and the names of two others who did not supply permits. They also indicated that Brian Nielsen, an assistant guide or outfitter, had conducted activity at the lodge that was in violation of Nebraska state laws, as far as killing animals without proper licenses. According to Agent Webb, the Johnsons went into great detail explaining how Nielsen had operated as a booking agent for them and how they were no longer using Mr. Nielsen as a booking agent because of some financial problems they were having with him. They had recently obtained the services of another booking agent.

Agent Webb testified he was somewhat surprised by the attitude of Danny Johnson, who was very matter of fact that he understood that what they had done was wrong, and that if it required him to plead to a felony and go to prison, he understood that and was willing to do so. (Doc. 54, 91:21-25).

Webb further testified that during the 45-minute visit he asked for, and the Johnsons produced, a coyote skin from a location in their house. Webb explained that another suspect told them he had shipped illegal coyote back to the lodge. Specifically, an individual from

Minnesota, who was being federally charged under the Lacey Act, told Webb he had killed the coyote, had it tanned, and mailed it back to the lodge personally. The officers wanted to retrieve the pelt from the Johnsons on their way back from Wisconsin, as it would save Agent Webb a five-hour round trip between Lincoln and Decatur.

Agent Webb recalled that the Johnsons specifically asked whether or not they could continue to book hunts and guide. Webb advised them that, under our judicial system, they were innocent until proven guilty; however, if the case moved rapidly, they would at least need to know that if they booked hunters and were charged and convicted under the Lacey Act, it was likely they would be prohibited from guiding after a conviction. They would also need to be aware of the possibility that they might not be able to fulfill their contractual obligations to future clients. Otherwise, they were under no restrictions at that point as to what they could and could not do.

Webb admitted he was carrying a weapon which was visible. No restrictions were made on the Johnsons' movement about the house. Webb admitted that during the conversation with the Johnsons, the activities of their children were discussed as well as their past cooperation and continued cooperation.

Nebraska Conservation Officer John Reeves testified that on July 11, 2007 he was returning with Webb from Wisconsin in the late afternoon or early evening. To avoid making a future trip, they decided to stop at the Johnson residence to talk to the Johnsons about a coyote pelt.

Reeves testified that when they arrived at the Johnson home, the Johnsons were seated on bar stools in the kitchen area. The Johnsons offered Webb and Reeves refreshments, and Reeves took a bottle of water. Reeves admitted that no *Miranda* warnings were ever given. He estimated the length of the interview to be about 45 minutes. It was a question-and-answer session, which included concerns about who had purchased or paid for hunting permits. The officers made the Johnsons aware that they knew the permits were used by people to whom they were not issued. The focus of this questioning was who actually obtained the permit to give to the Wisconsin hunters, not what liability the Johnson children might have for doing so.

Officer Reeves also noted that Danny Johnson was not concerned about felony charges or serving time. The visit was cordial and polite, including the conversation that the Johnsons had not sought legal counsel and Agent Webb informing them that it might be a good idea to do so. Reeves noted that during the visit the Johnsons were free to move about or leave. He did not hear Webb tell the Johnsons that their cooperation would help their children. Rather, the children were referenced in conversation as to who obtained hunting permits and who may be liable.

Lorna McGovern testified that she was a house guest at the Johnson home and is a longtime friend of Patti Johnson. She noted that the day before, Patti Johnson had shots in her back, and that while officers were present, Patti was noticeably grimacing in pain, looked crippled, and was hunkered over in pain. McGovern stated that she never heard anyone tell

her she was free to leave, but she admitted she did leave to go to work. She did not know what time she left.

Dennis Gill, Patti Johnson's brother, testified that he is a farmer and owns the Johnson real estate. On May 16, 2007 between 6:30 and 7:00 a.m., he received a call from Patti that a search warrant was being served, the house was full of game wardens, and she wanted him to come over right away. It took Gill about 15 minutes to drive to the Johnson home. He walked into the house and was asked to go back outside and speak with an officer in the officer's pickup truck. He asked for permission to go back in the house, but was told it would be better if he did not. He stayed in the pickup for about half an hour. Gill testified that he spoke with four officers. Gill said he never was told he was free to leave and he did not feel he was free to leave. He stated the Burt County Sheriff arrived and left.

Patti Johnson testified that on May 16, 2007 she was suffering from severe back pain and Lorna McGovern stayed overnight to help her. On the 16th she found it difficult to walk. Her first contact was with Agent Damico, who told her to sit down and began questioning right away–she believes around 7:00 a.m. She stated that she was not advised she was free to leave, that the questioning was constant, and that she felt like "after three hours it was just tell him anything to get them to go away." (Doc. 56, 95:3-4). Ms. Johnson testified that she believed there were nine to 11 officers present. During the interview she got up several times, moved around and, on one occasion, told the officers of her prior day's surgery, as well as informing them that she was taking drugs for her back. According to Patti Johnson, Agent

Damico raised his voice. She stated she was never Mirandized and never felt she was able to leave, but did admit that she called her work and did also call her brother. She did not ask permission to make either call.

Patti Johnson noted she believed if she accepted responsibility the agents would go away and not come back. If they cooperated and continued to cooperate there would be no need to charge their children. She also stated that while no arrests were made on the day the search warrant was served, she thought they would be arrested before the end of the day.

Patti Johnson testified that during the July 11, 2007 visit by Officer Webb, Webb spoke of past cooperation–that it was important, and could be involved in whether or not her brother or children were charged. She thought the visit on the July 11 lasted about one hour.

Patti admitted that during the May 16, 2007 search warrant execution, she took calls from her work, Danny took calls from his boss, and Danny made calls. She stated that about 11:30, Danny's boss brought a work trainee to the Johnson residence and left the trainee in Danny Johnson's pickup truck. She believed that she saw an officer with a gun drawn outside the house immediately before the search warrant was served, which added to her conclusion that things that day were "overwhelming."

Danny Johnson testified that he may have seen an agent run by a window before the search warrant was served, with a gun drawn. He said that agents had him sit down in the breakfast bar area of their home next to his wife, that he was never told that he was free to leave, "absolutely not." He believed there were at least three agents in the garage, two agents

in the big room, two agents upstairs, one in the back, and two to three in the garage for a total of 10 or 11. He verified that his work trainee was placed in his pickup truck sometime that morning by his boss. He also stated that during his contact with one of the agents, the agent put his hand on his weapon. Danny also noted that he told the officers at some point in time, probably around the writing of the affidavit, that he did not want to answer their questions.

## LEGAL ANALYSIS

The defendants contend they were interrogated on May 16, 2007 and July 11, 2007 in violation of their fifth amendment rights and *Miranda v. Arizona*, 384 U.S. 436 (1966). "A *Miranda* warning must precede any custodial interrogation. The issue presented to the court is whether the defendants were "in custody" when the statements were made.

A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

> The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation omitted). The "only relevant inquiry" in considering

-10-

> that question is how a reasonable person in [the defendant's] position would have understood his situation. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see generally Yarborough v. Alvarado,* 541 U.S. 652, ---- - ----, 124 S.Ct. 2140, 2147-50, 158 L.Ed.2d 938 (2004). In making that evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning. *United States v. Axsom,* 289 F.3d 496, 500 (8th Cir. 2002).

*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005). The court further observed that "[w]hen a person is questioned 'on his own turf,' ... the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Id.* (citation omitted). "'The most obvious and effective means of demonstrating that a suspect has not been taken into custody ... is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.'" *Id*. (quoting *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990)).

In this regard, the court credits agent Damico's testimony (Doc. 54, 16:23-17:5) that he told the Johnsons they were free to stay in the house, if they wanted to, while the officers were doing the search of the house, and they could talk to Damico or not, or they were free to go if they had to go. The only restrictions placed upon them were that they could not move around during the security sweep and, if they left, they probably would not be able to come back into the house until the search was completed. The Johnsons elected to stay and said they were willing to talk to Agent Damico. (Doc. 54, 18:17-19:8). The court finds credible Damico's testimony that he gave the Johnsons opportunities to opt out of answering his

questions. As the topic of conversation changed, Damico would ask if they wanted to talk to him about that topic or not. The Johnsons said that was fine and continued to talk to him. (Doc. 54, 19:20-20:1).

The Johnsons were not placed under arrest on either May 16, 2007 or July 11, 2007. Their movements were not significantly restricted on May 16 and were not at all restricted on July 11. They chose to remain in the house during the execution of the search warrant, although they were advised that they could leave. They were not required to talk to any of the officers but chose to do so on both occasions knowing that they were under investigation.

In determining whether an individual was "in custody" for purposes of *Miranda* analysis, the court's ultimate inquiry must always be whether the defendant was restrained as though he or she were under formal arrest, based on the historical facts of the case. *United States v. Czichray*, 378 F.3d at 828. In this case, the historical facts of the case do not support the defendants' arguments that they were in custody or that their statements were extracted by threat, express or implied, which was sufficient to overbear their will and critically impair their capacity for self determination.

## RECOMMENDATION

Because the defendants were not in custody when they were interviewed on May 16, 2007 and July 11, 2007,

**IT IS RECOMMENDED** that their Motions to Suppress Statements (Filings 31 & 32) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing an "Objection to Report and Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED August 28, 2008.**

                                **BY THE COURT:**

                                **s/ F.A. Gossett**
                                **United States Magistrate Judge**